1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Trenton R. Kashima (SBN No. 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
402 West Broadway St., Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
tkashima@milberg.com

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

JERRY LOSSON, individually and on behalf of
all others similarly situated,

                    Plaintiff,

        v.

FEDERATION INTERNATIONALE DE
FOOTBALL ASSOCIATION,

                    Defendant.

Case No.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

Plaintiff Jerry Losson ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Fédération Internationale de Football Association ("FIFA" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing its digital subscribers' personally identifiable information and viewed video media (collectively, "Personal Viewing Information") to a third party, Meta Platforms, Inc. ("Facebook"). Plaintiff's allegations are based on personal knowledge as to himself and his own acts and upon information and belief, including further investigation by Plaintiff's attorneys, as to all other matters.

**NATURE OF THE ACTION**

1.     This is a consumer digital privacy class action complaint brought on behalf of all persons with Facebook or Instagram accounts who have digital subscriptions to, and have watched videos on, *UEFA.com* and *UEFA.tv*, multimedia websites owned and operated by Defendant.

2.     Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without first obtaining its digital subscribers' express consent in a stand-alone consent form that complies with the VPPA's statutory requirements.

3.     Through the UEFA Website, FIFA used first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching and Conversion API, to purposely track, record, collect, and transmit its digital subscribers' interactions with UEFA.com and UEFA.tv. Defendant purposely sent its digital subscribers' viewing history and personally identifiable information to its third-party business partners, including Facebook.

4.     Defendant knowingly installed the Facebook Pixel tool onto UEFA.com and UEFA.tv and controlled which types of information and data was tracked and transmitted to Facebook. In conjunction with this, Defendant purposefully and specifically chose to: (1) track and record its

digital subscribers' viewed video media, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual Facebook IDs ("FID") and other persistent identifiers, and (3) did this without its digital subscribers' knowledge or consent using surreptitious technology.

5.      Importantly, digital subscribers' Personal Viewing Information—i.e., their persistent FID and viewed video content—are combined and sent as one data point. Since an FID is used to identify a specific individual and their corresponding Facebook account, Facebook or any ordinary person can use it to locate, access, and view a particular digital subscriber's.

6.      Defendant profited from its practice of disclosing digital subscribers' Personal Viewing Information to Facebook, and it did so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

7.      Because Defendant's digital subscribers were not informed about this dissemination of their Personal Viewing Information—indeed, the transmission of data is automatic and *invisible*—they could not exercise reasonable judgment to defend themselves against the highly personal ways UEFA has used their data for its own benefit.

8.      Defendant chose to disregard Plaintiff's and hundreds of thousands of other digital subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook.

9.      Accordingly, Plaintiff brings this class action lawsuit for legal and equitable remedies to redress Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook, Google, and any other unauthorized third-parties in knowing violation of VPPA.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

---

[1] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

12.     This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States and with this District, is engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of California.  Specifically, Defendant's website, UEFA TV, deliberately targets the United States market by delivering tailored content to consumers depending on where they are located, including those located in the United States.  Defendant has contracted with numerous United States-based companies located in various states, including Meta, Google, CBS, and Paramount, for services targeted at consumers in the United States who visit the website at issue.  Defendant has further contacts with the United States through its history of numerous applications for trademark protection with the United States Patent and Trademark Office, and its continual holding of active trademarks in U.S. markets including trademarks used on the website at issue.  Defendant has thus purposefully availed itself of the laws of the United States and California.

13.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District. Further, Plaintiff resided within this judicial district at all times material hereto.

## PARTIES

*Plaintiff Jerry Losson*

14.     Plaintiff Jerry Losson is an adult citizen of California domiciled in Castro Valley, California.

*Defendant*

15.     Fédération Internationale de Football Association is an international football organization that owns and operates The United European Football League ("UEFA"), and its

corresponding website, *UEFA.com* and *UEFA.tv*. Defendant delivers and is in the business of delivering countless hours of video content to its digital subscribers. Fans can create a free account for full access to all videos and content on *UEFA.com* and *UEFA.tv*. The *UEFA.com* website averages approximately 13,200,000 visits per month.

## FACTUAL BACKGROUND

**I. Background of the Video Privacy Protection Act**

16. The VPPA prohibits the knowing disclosure of a consumer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations."

17. Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

18. The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

19. Senators expressed concern and outrage over the non-consensual disclosure of consumers' video rental histories, describing the practice as a "pervasive form of surveillance" that improperly invades the lives of private citizens.[2]

20. The personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams

---

[2] As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively). In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." 134 Cong. Rec. S5399 (May 10, 1988).

21.     The importance of legislation like the VPPA is more pronounced than ever before because we live in the age of data mining wherein anything a person says, does, or watches is recorded and compiled into a persistent record beginning in early childhood.

22.     Senator Leahy emphasized this at a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," explaining that: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[3]

23.     In this case, FIFA violated Plaintiff's and Class Members' privacy rights by systematically disclosing their Personal Viewing Information to Facebook.

**II. Defendant is a Video Tape Service Provider**

24.     Just like "department store[s]," "golf shop[s]," and "continuity club[s]," which the VPPA's legislative history suggests may qualify as video tape service providers, Defendant is a video tape service provider. *See* S. Rep. 100-599, at 12-13.

25.     Defendant owns and operates the *UEFA.com* website and the *UEFA.tv* website and respective apps, a multimedia organization that provides United European Football League game updates, news, interviews, and commentary, all of which is featured on its website and available to digital subscribers at *UEFA.com and www.UEFA.tv*.

26.     Through *UEFA.com*, Defendant creates, hosts, and disseminates numerous videos, and a specific portion of the website is dedicated to video content:

---

[3] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology, and the Law, https://www.judiciary.senate.gov/committee-activity/hearings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last accessed November 6, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20        27.    *UEFA.com* also has a mobile app where users can watch highlights on their mobile

21 phone:[4]

22

23

24 [4] BING,
25 ttps://www.bing.com/images/search?view=detailV2&ccid=c7%2FDlBX4&id=0BF79DA1FEE419
4B452DA4AC8D45335CF1C2C947&thid=OIP.c7_DlBX4erjp1WsGQMzLOQHaEK&mediaurl=
26 https%3A%2F%2Feditorial.uefa.com%2Fresources%2F026f-13c8a73267c3-7105d77b52fe-
1000%2Fuclapp_20211122163922.jpg&cdnurl=https%3A%2F%2Fth.bing.com%2Fth%2Fid%2F
27 R.73bfc39415f87ab8e9d56b0640cccb39%3Frik%3DR8nC8VwzRY2spA%26pid%3DImgRaw%2
6r%3D0&exph=1152&expw=2048&q=uefa+mobile+app&simid=608044666794611481&form=I
28 RPRST&ck=7456633701DECF63A3FE184902DE7A02&selectedindex=1&ajaxhist=0&ajaxserp=
0&vt=0&sim=11 (last visited November 19, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13



14      28.    Defendant monetizes this content and uses it to drive webpage traffic and encourage

15 users to sign up for also restricts access to its digital content, including videos for *UEFA.com*.  To

16 access that content on a consistent basis a user must sign up for a subscription.

17      29.    Defendant also has a *UEFA.tv* website where users can watch their favorite games,

18 live. There, if one watches tv on *UEFA.tv* their information is sent to Google. It is believed that

19 Google can identify people much in the same way that Facebook can (anyone with a gmail account

20 is required to register with their PII), and Google stores identifiers on devices.

21      30.    Although the full extent of Defendant's data violations is presently unknown, its Web

22 Properties are actively sharing subscriber's private viewing information with Google via Google

23 Analytics.

24      31.    Every time a subscriber requests or views a video, the name of the requested or viewed

25 video is sent to Google alongside information that allows it to ascertain the subscriber's real identity.

26      32.    This is confirmed by the image below, which includes the highlighted text of the exact

27 video title the user requested and viewed.

28



33.     *UEFA.tv* is also on a mobile application, there users can watch their favorite games from their mobile phone:[5]



[5] BING,
https://www.bing.com/images/search?view=detailV2&ccid=JnxU2CcP&id=78E390D07071E6C28
DDE35E9688098D8FEC64DE6&thid=OIP.JnxU2CcPk6_yLDsszui71QHaFj&mediaurl=https%3a
%2f%2fimg.tuttoandroid.net%2fwp-
content%2fuploads%2f2019%2f06%2fUEFAtv.jpg&cdnurl=https%3a%2f%2fth.bing.com%2fth%
2fid%2fR.267c54d8270f93aff22c3b2ccee8bbd5%3frik%3d5k3G%2552ftiYgGjpNQ%26pid%3dIm
gRaw%26r%3d0&exph=1440&expw=1920&q=uefa.tv+app&simid=608006398648216590&FOR

34.     Thus, Defendant uses these videos as a means of increasing its revenue through advertisements, selling data to Facebook collected from users, and other means.

35.     Nowhere on either the website versions of *UEFA.com* and *UEFA.tv*, or the respective apps does Defendant provide any place for a user to consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" to having their information transmitted to Facebook or Google.

**III. Plaintiff and Class Members are Consumers**

36.     To subscribe to Defendant's newsletter and other services, at a minimum, individuals must create an online account and share identifying information, while users can also pay money on a recurring basis to access additional content. By doing so, individuals subscribe to Defendant's website.

37.     Plaintiff and other Class Members registered and became subscribers in order to access video content that is not otherwise available to non-subscribers.

**IV. Defendant Knowingly Disclosed Subscribers' PII to Facebook**

38.     Defendant knowingly disclosed its subscribers' Personal Viewing Information to Facebook by installing and using Facebook's Tracking Pixel and Business Tools.

39.     These tools are pieces of software that must purposefully be integrated into a website or apps source code by its owner, in this case Defendant.

40.     Thus, Facebook would not have received Plaintiff's or other Class Members' Personal Viewing Information but for Defendant's decision to install the tracking software.

41.     Moreover, Facebook gives website operators, such as Defendant, control over the categories of information and data that's tracked, recorded, and transmitted.

42.     Defendant's knowledge as to its conduct is evidenced by: (1) the fact that it chose to track its digital subscribers' interactions with *UEFA.com* and *UEFA.tv*, including the videos they viewed; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines

M=IRPRST&ck=9929210B067A28687EA6F11CECF7EF18&selectedIndex=1&ajaxhist=0&ajaxs erp=0 (last visited November 19, 2023).

of code from Facebook in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via *UEFA.com* and *UEFA.tv*.

### A.    *UEFA's* Digital Subscriptions

43.    To subscribe to *UEFA.com* and *UEFA.tv*, users must register by providing their email address, full name, and street address. They can also login with their Facebook account, google account, or email address. None of these options provide any written consent to have any data from their account given to Facebook or Google.

44.    Digital subscribers also provide Defendant with their IP address,[6] mobile devices identifiers, and other persistent identifiers.

45.    Defendant did not disclose that it would share digital subscribers' Personal Viewing Information with third parties, such as Facebook, during the registration process or when digital subscribers logged in and viewed video media.

46.    Notably, Defendant never obtained its digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

### B.    Facebook and the Tracking Pixel

47.    Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life.  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

48.    Businesses, such as UEFA use Facebook's Business Tools, including tracking pixels, to monitor and record their website visitors' devices and activities on a particular website. As a result, website visitors' browsing data and interactions with a website are sent to Facebook, which then uses the information for marketing purposes.

49.    The Facebook pixel tracks users' actions on websites that have installed the pixel and reports the information—such as which videos were viewed—back to Facebook.

---

[6] An IP address unique number assigned to all information technology connected devices.

50.     Defendant's motivation for using the pixel and related Facebook Business Tools is simple— it financially benefits it in the form of advertising and information services. When an *UEFA.com* or *UEFA.tv* digital subscriber enters the website and views video media, that information is sent to Facebook.

51.     The information Facebook receives identifies a specific individual *UEFA.com* or *UEFA.tv* digital subscriber (Facebook ID) alongside the name of the viewed video content (contained in an unredacted URL and microdata).

52.     The Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name.

53.     These transmissions were invisible and resulted from Defendant's purposeful use of the Facebook tracking pixel.

54.     Notably, Defendant could have easily programmed the website such that this information was not automatically transmitted or such that the names and titles of video content were obscured. It did not do that.

55.     Any ordinary person who comes into possession of an FID can easily use that information to identify a particular individual and can connect to their Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts.

56.     This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

**C.     Defendant's Transmissions via the Facebook Pixel**

57.     Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the video media that each of its digital subscribers viewed.

58.     The data Defendant shared with Facebook is not anonymized.

59.     For example, Figures 1 and 2 illustrate what information was sent to Facebook when a digital subscriber requested or viewed video content via *UEFA.com*, and specifically the video titled, "*President Ceferin Speaks at 47th Ordinary UEFA Congress.*"



- **url**:
  - https://www.facebook.com/tr/?id=2093040297597992&ev=PageView&dl=https://www.uefa.com/insideuefa/video/0280-17b43bde30aa-8ae15f9eacab-1000--president-ceferin-speaks-at-47th-ordinary-uefa-congress/&rl=https://www.uefa.com/insideuefa/video/&if=false&ts=1681122441444&cd[domain]=www.uefa.com&cd[user_logged-in]=--&cd[platform]=UEFA Web&sw=1366&sh=768&v=2.9.100&r=stable&a=tmSimo-GTM-WebTemplate&ec=0&o=29&cs_est=true&fbp=fb.1.1681122353932.1453509823&it=1681122440522&coo=false&tm=1&rqm=GET
- **queryString**:
  - **id**: 2093040297597992
  - **ev**: PageView
  - **dl**: https://www.uefa.com/insideuefa/video/0280-17b43bde30aa-8ae15f9eacab-1000--president-ceferin-speaks-at-47th-ordinary-uefa-congress/
  - **rl**: https://www.uefa.com/insideuefa/video/
  - **if**: false
  - **ts**: 1681122441444
  - **cd[domain]**: www.uefa.com
  - **cd[user_logged-in]**: --
  - **cd[platform]**: UEFA Web
  - **sw**: 1366
  - **sh**: 768
  - **v**: 2.9.100
  - **r**: stable
  - **a**: tmSimo-GTM-WebTemplate
  - **ec**: 0
  - **o**: 29
  - **cs_est**: true
  - **fbp**: fb.1.1681122353932.1453509823
  - **it**: 1681122440522
  - **coo**: false
  - **tm**: 1
  - **rqm**: GET
- **cookies**:
  - **sb**: ewMyYqaTMtIs-sx4Y6lmlkwj
  - **datr**: ewMyYtQzmmMstZpZmB22bB2u
  - **c_user**: 100█████████████
  - **xs**: 8:52_RIPQPphEZ_A:2:1678031717:-1:5353:-AcXZekg-cP4djbQ8C6wNlXcXPyH5-IBMsbqd6zPo-yE
  - **fr**: 0bW6foRQGKD7Gw0sY.AWWXedxTn7Huo5iG3bdnWSNSVB4.BkMZlU.f8.AAA.0.0.BkMZlU.AWUs6cN0kDM

60.     When the user selected the video, its exact title was transmitted to Facebook alongside their Facebook ID, thereby revealing which video content the specific individuals requested and

viewed. The phrase "president ceferin speaks at 47th ordinary uefa congress" is highlights in the image below, and the phrase "insideuefa/video" further articulates that the user requested and viewed video content. The string of numbers "id:2093040297597992" corresponds to Defendant's own Facebook identifiers, and the user's Facebook ID is contained in the "c_user" cookie below.[7]

61.   Defendant is required to comply with the VPPA's statutory consent requirements prior to sharing its digital subscribers' Personal Viewing Information with third parties, and it failed to do that.

62.   Even Facebook forbids the disclosures at issue in this complaint, and it requires its advertising partners, such as Defendant, to comply with the VPPA (and relevant state laws) when using its Business Tools.

63.   The tracking pixels are not necessary for Defendant to operate *UEFA.com* or *UEFA.tv*. Rather, their sole purpose and function is to enrich Defendant's advertising and marketing efforts at the expense of its subscribers' privacy.

**D.    Plaintiff Losson's Digital Subscription to *UEFA.com***

64.   Plaintiff Jerry Losson became a digital subscriber to *UEFA* by providing, among other information, Facebook Account, his name, address, email address, IP address, device identifiers, and other persistent identifiers.

65.   He has been a *UEFA.com* digital subscriber for several years beginning in or around 2020. He used his digital subscription to request and view video media on Defendant's *UEFA.com* website. Plaintiff Losson has also had a Facebook account for several years, which he regularly accesses from the same devices that he used to request and watch Defendant's video content. Plaintiff Losson's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein without his knowledge or consent.

66.   In exchange for providing information, Defendant gave him access to video content that would have otherwise been unavailable to him as a non-subscriber.

---

[7] This is a screenshot taken from a network traffic report, which depicts a website user's viewing information being sent to Facebook (including the title of the video) alongside the user's personal identifying information (c_user cookie or Facebook ID).

67.     Plaintiff Losson also pays for his digital subscription to *UEFA* content and receives emails and other news alerts from Defendant in conjunction with this subscription.

68.     During the last year, Plaintiff Losson used his subscription to view video media on *UEFA.com* and specifically recalls watching pre-recorded videos such as game highlights from his favorite Champions League teams.

69.     Plaintiff Losson has had a Facebook account for several years, which contains additional personal information and other personal details, and Facebook received his Private Viewing History from Defendant, including the specific titles of the videos he watched.

70.     Plaintiff Losson never had any knowledge, indication, or idea that Facebook was secretly disclosing his Personal Viewing Information.

71.     Plaintiff Losson never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook.

72.     Plaintiff Losson has never been provided any written notice that Defendant was disclosing its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures.

73.     Moreover, Plaintiff Losson was unaware of Defendant's wrongful tracking practices until approximately October of 2023.

74.     Because Plaintiff Losson is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived him of the full set of benefits to which he was entitled to as a digital subscriber.

## V.     CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(3), and/or (c)(4). Specifically, the Class is defined as:

> All persons in the United States with a digital subscription to *UEFA.com* and/or *UEFA.tv* who had their Personal Viewing Information disclosed to Facebook by Defendant within the maximum amount of time permitted by law.

76.     Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

77.     <u>Numerosity</u>. Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. Plaintiff believes that there are hundreds of thousands of Class Members widely dispersed throughout the United States. Class Members can be identified from Defendant's records and non-party Facebook's records.

78.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and Class Members were harmed by the same wrongful conduct in that Defendant caused their Personal Viewing Information to be disclosed to Facebook without obtaining express written consent in a form that comports with the VPPA's statutory requirements. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

79.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.  Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

80.     <u>Commonality and predominance</u>. Questions of law and fact common to the Class members predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include:

(a)     Whether Defendant knowingly disclosed Class Members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class Members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class Members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)    Whether Class Members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B);

(e)    Whether Defendant was unjustly enriched as a result of its disclosures; and

(f)    Whether the Class is entitled to damages as a result of Defendant's conduct.

81.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    TOLLING OF THE STATUTES OF LIMITATIONS

82.    All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered Defendant's practices of sharing their Personal Viewing Information and PII with Facebook until shortly before this class action litigation commenced because, amongst other things, the transmissions of data were invisible to ordinary consumers.

83.    Defendant was and remains under a continuing duty to disclose to Plaintiff and Class Members its practice of sharing Personal Viewing Information and PII with unauthorized third parties. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

84.     Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

85.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

86.     As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

87.     Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

88.     As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

89.     Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class Members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified Plaintiff and each Class Member to Facebook as an individual who viewed or requested specific video media through *UEFA.com*.

90.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff is a subscriber to *UEFA.com*, which provides digital subscribers with video media content through the digital subscriber's desktop, tablet, and/or mobile device. Thus, Plaintiff is a "consumer" under this definition.

91.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

92.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

93.     Defendant knew that its disclosures identified Plaintiff and Class Members to Facebook. Defendant also knew that Plaintiff's and Class Members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

94.     By disclosing Plaintiff's and the Class Members' Personal Viewing Information, Defendant violated Plaintiff's and the Class Members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

95.     As a result of the above violations, Defendant is liable to the Plaintiff and other Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment

96.     Plaintiff incorporates and realleges the above factual allegations by reference.

97.     Defendant acted wrongfully by sharing its digital subscribers' Personal Viewing Information with Facebook without first obtaining proper consent pursuant to the VPPA's statutory requirements (in a standalone consent form), and, as a result, Defendant profited from advertising revenue it would not have otherwise received. Notably, Defendant benefited to the detriment of Plaintiff and Class Members because it disregarded its digital subscribers' privacy rights for the sake of increasing its own revenue and profits.

98.     Defendant's retention of these ill-gotten gains is unjust and inequitable.

99.     Plaintiff, on behalf of himself and the Class, accordingly seek restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment. There is no adequate remedy at law that would provide redress to Plaintiff and the Class or ensure that Defendant will not deploy the same data practices in the future.

## VIII.   RELIEF REQUESTED

100.     Plaintiff, on behalf of himself and the proposed Class, respectfully request that this Court:

(a)     Determine that this action is properly maintained as a class action pursuant to Rules 23(a), (b)(1), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

(b)     For an order declaring that Defendant's conduct, as described herein, violates the VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     For Defendant to pay $2,500.00 to Plaintiff and each Class Member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)     For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

1

           (g)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees

2

      and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

3

**IX.    JURY DEMAND**

4

      101.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of

5

himself and the proposed Class, demand a trial by jury on all issues so triable.

6

7

Dated:  December 18, 2023               Respectfully submitted,

8

          **MILBERG COLEMAN BRYSON**

9

          **PHILLIPS GROSSMAN PLLC**

10

          By:  */s/ Trenton Kashima*
          Trenton R. Kashima (SBN 291405)

11

          402 West Broadway St., Suite 1760
          San Diego, CA 92101

12

          Tel: (619) 810-7047
          tkashima@milberg.com

13

14

          Nick Suciu, III*
          6905 Telegraph Rd., Suite 115

15

          Bloomfield Hills, MI 48301
          Telephone: (313) 303-3472

16

          E-mail:  nsuciu@milberg.com

17

          J. Hunter Bryson*
          900 W. Morgan Street

18

          Raleigh, NC 27603
          Telephone: (704) 941-4648

19

          E-mail:  hbryson@milberg.com

20

          L. Timothy Fisher
          **BURSOR & FISHER, P.A**.

21

          1990 North California Blvd., Suite 940
          Walnut Creek, CA 94596

22

          Telephone: (925) 300-4455
          Facsimile: (925) 407-2700

23

          E-mail: ltfisher@bursor.com

24

          Philip Lawrence Fraietta*
          1330 Avenue of the Americas, 32nd Floor

25

          New York, NY 10019
          Telephone: (646) 837-7150

26

          E-mail: pfraietta@bursor.com

27

          *\*Pro Hac Vice Application Forthcoming*

28

          *Attorneys for Plaintiff*